UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EASTHAMPTON CONGREGATIONAL CHURCH, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:17-cv-30061-KAR |
| CHURCH MUTUAL INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DEFENDANT CHURCH
MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 18 and 20)

ROBERTSON, U.S.M.J.

## I.      Introduction

On April 25, 2016, the ceiling in the Fellowship Hall of the Easthampton Congregational

Church ("the Church" or "Plaintiff") fell to the floor.  This is a dispute about whether the

Church's property insurance policy issued by Church Mutual Insurance Company ("Church

Mutual" or "Defendant") provides coverage for the loss.  The parties have cross-moved for

summary judgment on the issue of coverage.  For the reasons discussed below, Plaintiff's motion

is allowed, and Defendant's motion is denied.[1]

## II.      Applicable Legal Standard

"Summary judgment is proper where 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

_____

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes (Dkt. No.
13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). "For this purpose, an issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is 'material' only if it 'possess[es] "the capacity to sway the outcome of the litigation under the applicable law."'" *Id.* (alteration in original) (quoting *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997)). In determining whether genuine disputes of material fact exist, all reasonable inferences must be drawn in the non-movant's favor. *Id.* "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

"Under Massachusetts law,[2] the interpretation of an insurance policy and the application of policy language to known facts pose questions of law for the court to decide." *Nascimento v. Preferred Mut. Ins. Co.*, 513 F.3d 273, 276 (1st Cir. 2008) (citing *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 788 N.E.2d 522, 530 (Mass. 2003)). An insurance policy is construed under general rules of contract interpretation *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000) (citing *Merchants Ins. Co. of N.H., Inc., v. U.S. Fidelity & Guar. Co.*, 143 F.3d 5, 8 (1st Cir. 1998)). The court "begin[s] with the actual language of the policies, given its plain and ordinary meaning." *Id.* (citing *GRE Ins. Grp. v. Metro. Boston Hous. P'ship, Inc.*, 61 F.3d 79, 81 (1st Cir. 1995)). Where a term is undefined, it is appropriate for the

---

[2] The parties agree that Massachusetts law governs this dispute.

court to look to the dictionary definition for assistance in determining its ordinary meaning. *Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 498-99 (1st Cir. 2005) (citing *Ellery v. Merchs.' Ins. Co.*, 20 Mass. (3 Pick.) 46, 48 (1825)).

"If a term is 'susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one,' the term is ambiguous." *U.S. Liability Ins. Co. v. Benchmark Constr. Servs., Inc.*, 797 F.3d 116, 119-20 (1st Cir. 2015) (quoting *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998)). "[A]n ambiguity does not exist simply because the parties disagree about how to interpret the policy." *Id.* at 120 (citing *Citation Ins. Co.*, 688 N.E.2d at 953). "'Nor does the mere existence of multiple dictionary definitions of a word, without more, suffice to create an ambiguity, for most words have multiple definitions.'" *Cty. of Barnstable v. Am. Fin. Corp.*, 744 N.E.2d 1107, 1109 (Mass. App. Ct. 2001) (quoting *Citation Ins. Co.*, 688 N.E.2d at 953). "To the extent the policy language is ambiguous, any ambiguities must be construed in favor of the insured." *Clark Sch. for Creative Learning, Inc. v. Philadelphia Indem. Ins. Co.*, 734 F.3d 51, 55 (1st Cir. 2013) (citing *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007)). "'This rule of construction applies with particular force to exclusionary provisions.'" *U.S. Liability Ins. Co.*, 797 F.3d at 120 (quoting *Boazova v. Safety Ins. Co.*, 968 N.E.2d 385, 390 (Mass. 2012)).

The insured bears the initial burden of showing that the case involves a generally covered risk under the policy. *Stor/Gard, Inc. v. Strathmore Ins. Co.*, 717 F.3d 242, 247 (1st Cir. 2013) (citing *Boazova*, 968 N.E.2d at 390). If the insured makes this showing, the burden shifts to the insurer to show that an exclusion applies. *Id.* (citing *Boazova*, 968 N.E.2d at 390). And if the insurer satisfies that burden, the burden shifts back to the insured to show that an exception to the exclusion applies. *Id.* (citing *Boazova*, 968 N.E.2d at 390).

### III.    Facts[3]

#### A.  The Loss

On April 25, 2016, the ceiling in the Fellowship Hall section of the Church failed and fell to the floor.  The ceiling was not under construction, remodeling, or renovation at the time.  The Church had in effect a property insurance policy issued by Church Mutual ("the Policy"), and the Church promptly reported the ceiling failure to Church Mutual.

#### B.  The Policy

In the Policy, Church Mutual agreed to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations Page caused by or resulting from any Covered Cause of Loss."  The Fellowship Hall section of the Church is part of the premises described in the Declarations Page.  Church Mutual does not contest that the damage to the Fellowship Hall ceiling constituted direct physical loss of or damage to Covered Property at the premises insured by the Policy.

"Covered Causes of Loss" are defined as "Risks of Direct Physical Loss unless the loss is" excluded or limited.  Exclusion 2.j. excludes "loss or damage caused by or resulting from . . . Collapse, except as provided below in the Additional Coverage – Collapse."  The Additional Coverage – Collapse coverage part provides that "[t]he term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in D.1. through D.5. below."  Paragraph D.1.a. defines "Collapse" as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose."  The parties agree that the failure of the ceiling in the Fellowship Hall

---

[3] The facts are as set forth in the record and are undisputed.

4

constitutes a collapse within the meaning of the Policy. Paragraph D.2. provides, in pertinent part:

> [Church Mutual] will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form . . . , if the collapse is caused by one or more of the following:
>
> . . .
>
> b.    Decay that is hidden from view, unless the presence of such decay is known to any insured prior to collapse;
>
> . . .
>
> f.    Use of defective material or methods of construction, remodeling, or renovation if the collapse occurs during the course of construction, remodeling, or renovation. However, if the collapse occurs after construction, remodeling, or renovation is complete and is caused in part by a cause of loss listed in a. through e.; we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling, or renovation, contributes to the collapse.

The Policy does not define the term "decay."

In addition to the general exclusion for collapse, Exclusion 3.c. excludes loss or damage caused by or resulting from "[f]aulty, inadequate, or defective . . . [d]esign, . . .[or] construction . . . of part or all of any property on or off the described premises." However, a preamble to Exclusion 3.c. provides that "if an excluded cause of loss that is listed in . . . 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss." Exclusion 2.d. excludes loss or damage resulting from "[w]ear and tear," and "[r]ust, or other corrosion, decay, deterioration, hidden or latent defect, or any quality in property that causes it to damage or destroy itself."

C.  The Expert Report

On May 3, 2016, Joseph Malo, a Forensic Engineer with Donan Engineering, inspected the church and the ceiling failure at the request of Church Mutual.  Mr. Malo reported his findings and conclusions by letter dated May 11, 2016 ("the Report" or "Malo's Report").  The parties accept the contents of Malo's Report as agreed material facts.  In the Report, Malo confirmed that a major section of the ceiling of the Fellowship Hall section of the church had failed.  Malo explained the following about the ceiling:

> The ceiling consists of three different types of materials installed one over the other with a total thickness of approximately 3 ¾ inches . . ..  The original ceiling is constructed with wood lath and plaster attached to boards 2 ¼ inches by ¾ inch spaced 12 inches on center . . ..  The boards attached to the lath were attached to the ceiling joists approximately every 20 inches with cut nails with approximately 1 ¾-inch penetration . . ..  Approximately 1 ½-inch by ¾-inch boards are attached to the plaster and ¼-inch drywall attached to the boards.  The drywall was nailed to the 1 ½-inch by ¾-inch boards . . ..  Ceiling tiles approximately 12 inches by 24 inches by ½ inch thick are installed directly to the drywall . . ..

Mr. Malo reported that "[t]he ceilings failed as one unit, and the original cut nails attaching the ceiling to the joists have pulled out, leaving only holes in the bottoms of the ceiling joists . . .."

Mr. Malo explained the concept of nail withdrawal as follows:

> The resistance of a nail to withdrawal from a building material is related to the density or specific gravity of the material, diameter of the nail, and the depth of penetration.  The shank finish and condition of the nail and the point of the nail also influence the withdrawal resistance.  The smooth nail's connection is subject to significant loss of strength over time due to weakening of the material's grip on the fasteners, resulting in withdrawal.  The weakening of the connection is caused by cyclical volumetric changes induces [sic] by normal temperature and moisture changes in the building materials.  Modern ceilings are typically attached using screws or ringed nails that provide greater resistance to withdrawal than the smooth-sided fasteners used in this structure.

Mr. Malo concluded:

The ceiling failure is a result of progressive failure of the fasteners used to attach the layers of ceiling to the ceiling joists due to the weight of the ceiling. The connection failure could have taken a period of years to occur. The fasteners holding the layers of ceiling to the ceiling joists are oriented such that they are loaded in direct withdrawal. Smooth-sided fasteners such as these rectangular nails in direct withdrawal are loaded in pure tension and rely entirely on the frictional grip between either the wood or the plaster/lath and the fastener.

The ceiling system was inadequately fastened to the structure. The attachment system of the multiple types of ceiling to the original building is inadequate and did not have the capacity to support the weight of all the additional ceilings.

D. Coverage Denials

Church Mutual originally denied coverage by letter dated May 19, 2016, relying on Malo's Report and Exclusion 3.c. for faulty, inadequate or defective construction.[4] Specifically, Church Mutual stated, "[i]t appears that the interior damage is a result of a constructional defeat [sic] with the ceiling. The summary of Mr. Malo's report suggest [sic] that a few items contributed to the loss on April 25, 2016. Please review the Engineer's report which stated the following: The fasteners used to uphold the ceiling were inadequate for the size/weight of the ceiling, and the ceiling system was not adequately fastened to the structure."

Thereafter, the Church asked Church Mutual to reassess the claim based on the Additional Coverage – Collapse coverage part. By letter dated July 1, 2016, Church Mutual again denied coverage in reliance on Malo's Report. Church Mutual stated that "[t]he engineer determined the cause of the ceiling collapse was the inadequacy of an attachment system to secure the progressively heavier weight of three layers of ceiling material over time, and not to

---

[4] Church Mutual also cited Limitation 1.c. of the Policy, which applies to damage to the interior of a building or structure caused by or resulting from rain, snow, sleet, ice, sand, or dust. However, Limitation 1.c. is not applicable as there is no evidence that the ceiling failure was caused by rain, snow, sleet, ice, sand, or dust.

any hidden decay of materials.  As such, the provision of the additional coverage for collapse provided by your policy does not provide coverage."

In response, counsel for the Church forwarded correspondence dated September 26, 2016 to Church Mutual, arguing that that the loss was covered under the terms of the Policy.  The Church argued that Exclusion 3.c. did not apply since the ceiling had lasted for more than 60 years.  Moreover, even if it did, coverage was afforded under the Additional Coverage – Collapse coverage part for collapse caused by decay that was hidden from view and unknown to the insured prior to the collapse, since Malo's Report "concluded that the progressive failure of the fasteners over a long period of time caused the ceiling to collapse."

By letter dated October 21, 2016, Church Mutual reiterated its denial of coverage.  It again argued that Exclusion 3.c. applies because Malo's Report "concluded that the ceiling failure was the result of the attachment system (*i.e.*, smooth-sided nails driven into wooden ceiling joists) not having the capacity to support the weight of all the additional ceilings that had been affixed to the original ceiling over the years.  Over time, the weight of the ceiling(s) eventually caused the nails (or some of them) to pull loose from the joists, resulting in a complete failure of the entire ceiling."  Moreover, Church Mutual denied that the failure of the ceiling was the result of decay, such as would trigger coverage under the Additional Coverage – Collapse coverage part because the collapse "was not caused by anything 'decaying'.  It was caused by design or construction means, methods, or materials that were inadequate to the task of securing the ceiling to the roof joists."

## IV.  Discussion

As set forth above, Church Mutual does not contest that the failure of the Fellowship Hall ceiling is a generally covered risk under the Policy.  Therefore, the Church has met its initial

burden, and the burden shifts to Church Mutual to show that an exclusion applies. *Stor-Gard*, 717 F.3d at 247. Church Mutual maintains that two exclusions apply – Exclusion 3.c. for faulty, inadequate, or defective design or construction and Exclusion 2.d. for wear and tear or for any quality in property that causes it to damage or destroy itself.[5] The Church disputes the applicability of either exclusion. Further, the Church argues that the failure of the Fellowship Hall ceiling is a Covered Cause of Loss under the Additional Coverage – Collapse coverage part because it was a collapse caused at least in part by decay that was hidden from view and unknown to the Church prior to the collapse. Church Mutual agrees that a collapse occurred within the meaning of the Policy and concedes that if the Church can show that decay contributed to the collapse even in part, the collapse is covered under the Additional Coverage – Collapse coverage part. However, Church Mutual disputes that the Church has shown that decay contributed to the collapse even in part, and, therefore, maintains that the Additional Coverage – Collapse coverage part is inapplicable. Because the parties agree that the loss constituted a collapse and that there is coverage if the Church can show that decay in part caused the collapse, the court addresses the Additional Coverage – Collapse first.

    A. The Additional Coverage – Collapse

    Taken together, the general collapse exclusion and the Additional Coverage – Collapse coverage part mean that the Policy provides coverage for only certain kinds of collapse, one of which is collapse that is caused by "[d]ecay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." Moreover, for collapses occurring "after construction, remodeling, or renovation is complete," as here, the Policy provides coverage if the

---

[5] While Exclusion 2.j. generally excludes collapse, and the parties agree that the failure of the Fellowship Hall ceiling is a collapse within the meaning of the Policy, Church Mutual does not rely on this exclusion.

collapse is caused "in part" by "[d]ecay that is hidden from view" and unknown to the insured prior to the collapse, "even if use of defective material or methods, in construction" also contributes to the collapse. Thus, the question for the court is whether the Church has produced evidence establishing that decay that was hidden from view and unknown to the Church contributed to the collapse.

As set forth above, the term "decay" is not defined in the Policy. Neither party suggests that the term is ambiguous. The Church argues that the meaning of the term as used in the Policy encompasses a slow progressive loss of strength. Church Mutual does not argue for any particular meaning of the term. Because the term is undefined, the court turns to dictionary definitions to ascertain its ordinary meaning. *Raytheon*, 426 F.3d at 498-99. The Merriam-Webster Dictionary's pertinent definitions of "decay" include: "1: gradual decline in strength, soundness, or prosperity or in degree of excellence or perfection . . . 2: a wasting or wearing away: ruin . . . [and] 4 a: rot . . . specifically: aerobic decomposition of proteins chiefly by bacteria . . . ." Decay Definition, https://www.merriam-webster.com/dictionary/decay (last visited May 9, 2018). Similarly, the Oxford English Dictionary defines "decay" as: "1. a. The process of falling off from a prosperous or thriving condition; progressive decline. . . . 3. a. Of material things: Wasting or wearing away, disintegration; dilapidation, ruinous condition. . . . 5. The destructive decomposition or wasting of organic tissue; rotting." Decay Definition, www.oed.com/view/Entry/48067?rskey=z7ljDr&result=1#eid (last visited May 9, 2018). Thus, dictionary definitions of decay include both the broader concept of a gradual deterioration or decline in strength or soundness and the narrower concept of organic decomposition or rot. Despite the existence of multiple definitions, the court finds that the term "decay" is unambiguous because it is not readily susceptible of more than one meaning as it is used in the

Policy.  The most reasonable reading of the word "decay" as it is used in the Policy is that it refers to the broader concept of the word.  This is because the Policy elsewhere uses the term "rot" in an exclusion for "'Fungus,' Wet Rot, Dry Rot and Bacteria."  If Church Mutual wanted to limit coverage for collapse to collapse caused or contributed to by "rot," as opposed to "decay," it could have done so.  It did not, and the only reasonable implication is that the plain and ordinary meaning of "decay" as used in the Policy encompasses decay in the broader sense of a gradual deterioration or decline in strength or soundness.  *Cf. Hani & Ramiz, Inc. v. North Pointe Ins. Co.*, No. 316453, 2014 WL 523492, at *3 (Mich. Ct. App. Feb. 4, 2014)  ("[T]he placement of '[f]ungus, wet rot, dry rot and bacteria' and 'decay' in separate paragraphs suggests that the parties did not intend to restrict the interpretation of 'decay' to biological decomposition . . .." (second alteration in original)).  This interpretation of decay is consistent with that of other courts to have addressed the issue.  *See Joy Tabernacle-The New Testament Church v. State Farm Fire & Cas. Co.*, 616 Fed. Appx. 802, 808-09 (6th Cir. 2015) (declining to adopt a narrow definition of "decay" as organic rot and instead applying a broader definition that includes "a general decline or degeneration over time"); *Hani & Ramiz*, 2014 WL 523492, at *3 (finding that decay is not limited to bacterial or fungal decomposition); *Quality Time, Inc. v. West Bend Mut. Ins. Co.*, No. 12-1008-JTM, 2013 WL 474289, at *13 (D. Kan. Feb. 7, 2013) ("Because the term decay may, consistent with popular understanding, be construed to mean gradual deterioration or degradation, without organic decomposition, this is how the court construes the term here.  The court specifically rejects the insurer's argument . . . that 'decay' is somehow restricted to rot or organic decay."); *PMW Real Estate Mgmt., LLC v. State Farm Fire & Cas. Co.*, No. 2:11cv1395, 2013 WL 3993759, at *5 (W.D. Pa. Aug. 5, 2013) (construing "decay" to mean "decomposition," "a process of wasting away," " a decline in quality," and "[w]asting or wearing

away, disintegration, dilapidation, ruinous condition"); *Ne. Center Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 1:03-CV-246TS, 2006 WL 842396, at *5 (N. D. Ind. Mar. 28, 2006) (concluding that "decay" "is not ordinarily understood to mean only 'rot,'" but rather, connotes "a progressive failure in strength and soundness" or "wasting and wearing away"). Moreover, to the extent that the term "decay" could be considered ambiguous, any ambiguity would be construed in favor of the Church as the insured. *Clark Sch. for Creative Learning*, 734 F.3d at 55. This would also result in the broader construction of the term "decay." *See Stamm Theatres, Inc. v. Hartford Cas. Ins. Co.*, 113 Cal. Rptr.2d 300, 302 (Cal. Ct. App. 2001) (finding "decay" to be ambiguous and construing it in favor of coverage, such that coverage for collapse due to "hidden decay," without express limitation of that term to organic decomposition, included collapse caused by a "concealed process of gradual loss in the strength of building materials").

Thus, having determined that the plain and ordinary meaning of "decay" as used in the Policy encompasses a gradual deterioration or decline in strength or soundness, the question becomes whether the Church has shown that the failure of the Fellowship Hall ceiling was caused, at least in part, by such a gradual deterioration or decline in strength or soundness. While it is an exceedingly close question, the court finds that it has. In his Report, Malo found that the three layers of ceiling material failed as a single unit, with the original cut nails attaching the ceiling to the joists pulling out and leaving only holes in the bottoms of the ceiling joists. Regarding the concept of nail withdrawal, Malo explained that the smooth nail's connection was subject to significant loss of strength over time due to a weakening of the wooden joists' grip on the nails, which resulted in withdrawal. He attributes this weakening of the connection between the wooden joists and the nails to cyclical volumetric changes in the wood induced by normal temperature and moisture changes. This gradual decline in the strength of the connection

between the building materials and the fasteners fits within the plain and ordinary meaning of the term "decay" when that term is construed to extend to gradual deterioration or a progressive failure in strength and soundness. It is undisputed that the Church had no prior knowledge of the weakening of the connection between the nails and the surrounding building materials in the ceiling before the April 25, 2016 collapse and that the process would have been hidden since the failing connection between the wooden joists and the smooth-sided nails was in the ceiling.

In resisting a finding of decay, Church Mutual emphasizes Malo's conclusion that the attachment system of the multiple types of ceiling to the original building was inadequate and did not have the capacity to support the weight of all three layers of ceiling material. Church Mutual maintains that this shows that the collapse was due to the use of "defective material or methods of construction, remodeling, or renovation," not decay, and, because the collapse occurred after construction, remodeling, or renovation was complete, it is not covered under the Additional Coverage – Collapse coverage part. Again, the word "defective" is not defined in the Policy, and, therefore, the court turns to dictionary definitions for assistance. *Raytheon*, 426 F.3d at 498-99. The Merriam-Webster Dictionary defines "defective" as "1 a: imperfect in form or function: Faulty." Defective Definition, https://www.merriam-webster.com/dictionary/defective (last visited May 9, 2018). The Oxford English Dictionary defines "defective" as "1. a. Having a defect or defects; lacking a required or necessary quality; deficient; imperfect; faulty." Defective Definition, http://www.oed.com/view/Entry/48766?redirectedFrom=defective#eid (last visited May 9, 2018). Thus, "defective" implies something deficient, imperfect, or faulty. With this definition in mind, the court agrees that the Malo Report establishes defective construction insofar as Malo found that the attachment system was not up to the task of supporting the weight of all three layers of ceiling material. But, this finding is immaterial to the outcome because the

Policy provides that, for collapses occurring after construction, remodeling, or renovation is complete, as here, there is coverage under the Policy if the collapse is "caused in part" by "decay" "even if use of defective material or methods, in construction, remodeling, or renovation contributes to the collapse." Because the Church has established that the collapse was "caused in part" by "decay," the loss is a Covered Cause of Loss for which Church Mutual agreed to pay even if defective construction also contributed to the collapse. Church Mutual effectively concedes as much when it acknowledges that the ceiling failed "because of the excessive weight of three layers of ceiling materials, combined with the normal, cyclical, volumetric changes in the surrounding wood, [which] eventually loosened the original nails to the point where they simply came out of the joists" (Dkt. No. 23 at 9). In other words, it was not only the excessive weight of the three layers of ceiling material that led to the collapse, but also the gradual degradation of the connection between the nails and the wooden joists.

The court's conclusion that Plaintiff has established decay is consistent with two cases cited by Plaintiff from other jurisdictions. In *Joy Tabernacle*, 616 Fed. Appx. at 803, the Sixth Circuit reversed the district court's grant of summary judgment to the defendant insurer in a coverage dispute involving the collapse of the ceiling of an 85 year-old church, finding that material issues of fact existed as to whether decay had occurred. The summary judgment record revealed that the roof framing system of the church exerted too much pressure on its walls, which eventually resulted in the collapse of the plaster ceiling affixed to the bottom of the trusses. *Id*. at 805-06. The top chords of the trusses were characterized by extensive cracking and splitting, and the cracks in the trusses in turn loosened the nailed connections of the metal lath to the supports, resulting in a loose ceiling. *Id*. The evidence also showed that the age of the wood was an issue because "'wood has decreased strength values when subjected to high long

term loading,' and the resulting tensions can lead to 'nails loosening over many years.'" *Id.* at

806. On this record, the court noted that the plaintiff church had likely carried its burden of

proving coverage under the collapse extension of the policy, which is indistinguishable from the

Additional Coverage – Collapse provision here.[6] *Id.* at 810. Specifically, the court found that

"deterioration and degradation of the wooden roof structure and walls [of the church] over a long

period of time may qualify as 'decay' that was 'hidden' and such decay may be what 'caused in

part' the ceiling collapse. Therefore such loss could be covered under the policy even though

'defective material or methods in construction' also 'contribute[ ] to the collapse.'" *Id.* at 811.

This is precisely the situation here where the deterioration of the connection between the wooden

---

[6] The relevant collapse coverage provided:

> b. We will pay for accidental direct physical loss to Covered
> Property, caused by collapse of a building or any part of a building
> that is insured under this coverage form or that contains Covered
> Property insured under this coverage form, if the collapse is caused
> by any one or more of the following:
>
> . . .
>
> (2) Decay that is hidden from view, unless the presence of
> such decay is knowns to an insured prior to collapse;
>
> . . .
>
> (6) Use of defective material or methods in construction,
> remodeling or renovation if the collapse occurs during the
> course of the construction, remodeling or renovation.
> However, if the collapse occurs after construction,
> remodeling or renovation is complete and is caused in part
> by a cause of loss listed in Paragraph (1) through (5), we
> will pay for the loss even if use of defective material or
> methods in construction, remodeling or renovation,
> contributes to the collapse.

*Id.* at 804.

joists and the nails over a long period of time "caused in part" the ceiling collapse,

notwithstanding the fact that defective methods in construction also contributed to the collapse.

In *Stamm Theatres*, 113 Cal. Rptr.2d at 302, a California appeals court reversed the trial

court's grant of summary judgment to the defendant insurer in a dispute involving the imminent

collapse of the ceiling of a nearly fifty year-old theater. The collapse was caused by certain

wooden roof trusses having cracked completely through. *Id*. at 303. One of the plaintiffs'

experts "attributed the failure of the trusses to the increased load caused by a partial reroofing, to

repeated cycles of elevated temperatures over the years which degraded the strength of the truss

members, and to the presence of knots in the bottom chords [of the trusses]." *Id*. That same

expert placed primary responsibility for the degradation on temperature differences, while a

second expert believed that the central factor was the cycles of high and low humidity which,

over time, eroded the ability of the wooden trusses to withstand their load. *Id*. at 303-04 The

*Stamm* court found that summary judgment had been improvidently granted to the defendant

insurer on this record because it was not unreasonable "given the dictionary definition of 'decay'

as gradual deterioration to a weakened state," for the plaintiffs to expect coverage for "hidden

decay" caused by the roof trusses having given way "because of deterioration at the cellular level

caused by the migration of water molecules in and out of the wood over the years, as the ambient

humidity level fluctuated." *Id*. at 308. Here, the Malo Report establishes a degradation of the

connection between the building materials and the fasteners due to cyclical volumetric changes

induced by normal temperature and moisture changes, which similarly supports a finding of

decay under the broader understanding of the word.

Nor does the court consider its holding to be in conflict with the decision of the First

Circuit in *Parker v. Worcester Insurance Co.*, 247 F.3d 1 (1st Cir. 2001), as Church Mutual

suggests.  In *Parker*, a defective concrete foundation had put the insured's home in danger of imminent collapse.  The court reversed the district court's entry of summary judgment for the defendant insurer, which had been granted on statute of limitations grounds under Connecticut law.  *Id*. at 3-6.  In remanding the case, however, the court noted (in dicta) that it did not see how the plaintiff could make out a claim under her policy of insurance even if her claim was timely.

*Id*. at 6.  Regarding potential collapse coverage, the court stated:

> [I]t is open to doubt whether defective concrete could be called "decay," especially when the term is read in the context of other specified causes (*e.g.* "[h]idden insect or vermin damage").
>
> This doubt is greatly reinforced by the final *covered* cause of collapse, which reads as follows: "Use of defective material or methods in construction . . . if the collapse occurs during the course of construction …."  This language directly deals with collapse caused by poor workmanship or materials, but expressly limits coverage in such cases to collapse *during* construction.  This arguably makes the clause of no use to [the plaintiff] and, even worse for her position, suggests that "decay" is not a backdoor to coverage for poor construction materials or workmanship.

*Id*. at 6 (second, third, and fourth alterations in original).  According to Church Mutual, what the First Circuit intended to convey by this language was that if "decay" were construed so broadly that it included defective concrete that led to 12 years of gradually worsening cracks in the foundation, then the policy's limitation of coverage to collapses caused by defective materials or methods in construction occurring only during construction would be rendered effectively meaningless.  "Coverage for 'decay' would be so expansive that it would encompass almost any construction deficiency, before or after completion of construction" (Dkt. No. 23 at 11). However true that may have been in the case of *Parker*, it is not true here.  As an initial matter, *Parker* is readily distinguishable because the collapse coverage for "poor workmanship or

materials" was expressly limited to collapse during construction.[7]  By contrast, here, the

"defective materials or construction" provision of Church Mutual's policy expressly provides

coverage after construction is complete when defective materials or construction combine with

hidden decay to cause the loss.  Thus, as the Church correctly notes, decay is not a backdoor to

coverage for defective construction or materials, but an express grant of coverage.  If Church

Mutual wanted to limit recovery to collapses caused *only* by decay or to exclude coverage where

decay contributed to the collapse, it could have done so.  Moreover, in *Parker*, the expert reports

established that the concrete was defectively mixed at the outset, as opposed to having

undergone a gradual decline in soundness over time, such as would support a finding of decay.

Malo's Report, on the other hand, establishes a gradual decline in the strength of the connection

between the smooth-sided nails and the wooden joists owing to cyclical volumetric changes

induced by normal temperature and moisture changes in the building materials over many years.

Thus, while there was an apparent absence of evidence of decay in *Parker*, here the record

---

[7] The Policy provided as follows:

> Collapse.  We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused *only* by one or more of the following:
>
> . . .
>
> b. Hidden decay;
>
> . . .
>
> f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

*Id*. at 7 (emphasis added).

supports a finding of decay.

The court disagrees with Church Mutual's contention that a finding of coverage on the facts presented would result in all collapses caused by defective materials and methods of construction, whether during or after construction, being covered. The insured still has to prove that one of the other enumerated causes of loss contributed to the collapse, and where an insured relies on hidden decay, the insured still has to show a gradual deterioration or decline in strength or soundness that was not apparent to the insured. If what occurred was that the materials or methods of construction were defective from the outset, as in *Parker*, the insured would not be able to meet this burden.

Accordingly, the court finds that the loss in question is covered by the Additional Coverage – Collapse coverage part of the Policy.

B. <u>Applicability of the Policy's General Exclusions</u>

In light of the express grant of coverage under the Additional Coverage – Collapse coverage part, the court finds that general Policy exclusions on which Church Mutual relies – for faulty, inadequate, or defective design or construction and for wear and tear or any quality in property that causes it to damage or destroy itself – are inapplicable. The court reaches this conclusion based on a plain reading of the Policy. The Policy provides that Church Mutual "will pay for direct physical loss of or damage . . . caused by or resulting from any Covered Cause of Loss." The Additional Coverage – Collapse coverage part provides that "[t]he term Covered Cause of Loss" includes collapses resulting from "[d]ecay that is hidden from view, unless the presence of such decay is known to any insured prior to collapse." Thus, where an insured establishes that hidden decay contributed to a collapse, as the Church has done here, the insured has established a "Covered Cause of Loss" for which Church Mutual is obligated to pay,

notwithstanding the provisions of any of the Policy's general exclusions.

That this is the correct reading of the Policy is reinforced by inconsistencies that would otherwise emerge between the general exclusions and the Additional Coverage – Collapse. Exclusion 3.c. bars recovery for damage or loss caused by "defective . . . construction, . . .[and] materials used in . . . construction," while the Additional Coverage – Collapse specifically allows recovery for collapse caused by the "use of defective materials or methods, in construction" where such use combines with an enumerated "cause of loss."  Likewise, Exclusion 2.d., excludes loss or damage resulting from "[w]ear and tear," and "[r]ust, or other corrosion, *decay*, deterioration, hidden or latent defect, or any quality in property that causes it to damage or destroy itself" (emphasis added), while the Additional Coverage – Collapse specifically allows recovery for "collapse . . . caused by . . . [d]ecay that is hidden from view."  The plain reading of the Policy advanced by the court avoids these inconsistencies.

Moreover, this reading of the Policy is consistent with that of a number of other courts which have found general exclusions in policies of insurance inapplicable to additional collapse coverage.  *Joy Tabernacle*, 616 Fed. Appx. at 811 ("Read in context and in conjunction with the collapse extension, the general exclusions for defective design and cracking do not foreclose coverage if the collapse extension is triggered."); *Quality Time, Inc.*, 2013 WL 474289, at *13 ("Schedule D provides a positive assurance of coverage in the event the insured demonstrates damage due to collapse caused by hidden decay.  If the facts establish that such a hidden decay collapse occurred, coverage exists, notwithstanding any general exclusion for collapse, or for wear and tear."); *Malbco Holdings v. AMCO Ins.*, 629 F. Supp. 2d 1185, 1192 (D. Or. 2009) (dismissing affirmative defenses based on general policy exclusions where insured advanced claim under specific additional collapse coverage); *Certain Underwriters at Lloyd's Subscribing*

*to Policy No. WDO-10000 v. KKM, Inc.*, 215 S.W.2d 486, 494-95 (Tex. Ct. App. 2006) ("The Provision for 'Additional Coverage' is not subject to the exclusions relied upon by [the insurer] but is rather a separate provision that supplements coverage already subject to the exclusions.  In other words, the 'Additional Coverage' provision supplements the coverage otherwise provided, extending it beyond the carved out exclusions."); *Stamm Theatres*, 113 Cal. Rptr.2d at 307 ("Obviously, [the insurer's] collapse coverage was not meant to be limited by the generally applicable policy exclusions.").

For this reason, the court does not need to address whether the evidence establishes that the collapse was caused by an excluded cause as Defendant contends.

## V.        Conclusion

For the foregoing reasons, the court GRANTS Plaintiff's motion for summary judgment regarding coverage and DENIES Defendant's motion.

IT IS SO ORDERED.

/s/ Katherine A. Robertson_____
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  May 10, 2018

21